UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **ZION HUNTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **22-10549-FDS** |
| | ) | |
| **EDDY CHRISPIN and BRIAN BERRY,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**MEMORANDUM AND ORDER ON**
**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

**SAYLOR, C.J.**

This is a civil-rights action alleging the use of excessive force by law enforcement.  The

complaint alleges that plaintiff Zion Hunter was riding a motorized dirt bike through Franklin

Park in Boston when defendant Eddy Chrispin, a Boston police officer, and defendant Brian

Berry, a Massachusetts State Trooper, attempted to stop him.  According to the complaint,

Officer Chrispin and Trooper Berry deliberately drove their cruisers in front of Hunter's bike to

effect the stop, injuring Hunter in the resulting collision.

The complaint asserts claims against both officers under 42 U.S.C. § 1983 for use of

excessive force in violation of the Fourth Amendment and for assault and battery under state law.

Both officers have moved for summary judgment on all claims, contending that at a minimum

they are entitled to qualified immunity.

 For the reasons set forth below, construing the record in the light most favorable to the

plaintiff, there is a dispute of material fact as to whether the defendants violated plaintiff's

clearly established constitutional rights or committed an intentional tort under state law.  The

motions for summary judgment will therefore be denied.

I.      **Background**

The following facts are undisputed unless otherwise noted.

A.      **Factual Background**

Zion Hunter is a resident of Canton, Massachusetts.  He was 19 years old in May 2020.

(ECF 76 Ex. 1 at 1).

Eddy Chrispin was a sergeant with the Boston Police Department in 2020.  (ECF 74 Ex. 2

at 4).  Brian Berry was a trooper with the Massachusetts State Police in 2020.  (ECF 68 Ex. 4 at

5).

On May 30, 2020, Hunter was riding a motorized dirt bike on Circuit Drive in Franklin

Park.  (ECF 76 Ex. 1 at 2, 5).  He heard police sirens approaching from outside the park.  (*Id.* at

2).  According to Hunter, he did not think he was the cause of the sirens, but he decided to "get

to a place of safety" by turning onto Pierpont Road, which ends in the rear parking lot of the

Franklin Park Zoo.  (*Id.* at 2; *Id.* Ex. 45 at 1).

As he came around a bend in the road and into the parking lot, he saw two police cruisers

about 400 feet ahead of him.  (*Id.* Ex. 1 at 2; ECF 78 at 13).  One cruiser, which belonged to the

Boston Police Department, was idling parallel to the field beside the lot, to Hunter's left and

facing him. (ECF 68 at 4; ECF 74 at 2; ECF 76 Ex. 1 at 2).  The other cruiser, which belonged to

the Massachusetts State Police, was close to the BPD cruiser; according to Hunter, it was

positioned diagonally, pointing toward him and toward the zoo across from the field.  (ECF 76

Ex. 1 at 2).[1]  There was enough room to pass to the right of the MSP cruiser, on the zoo side. (ECF 78 at 34; ECF 83 at 3).

Another cruiser, with lights and siren on, followed Hunter into the lot.  (ECF 77 at 7; ECF 78 at 7-8).  According to Hunter, at some point, he heard the cruiser's siren but did not see any blue lights.  (ECF 77 at 7).  He did not think the siren had anything to do with him.  (*Id.* at 18).  Neither cruiser in the lot had its lights or siren on.  (ECF 78 at 11).  Hunter continued forward, traveling between 20 and 30 miles per hour.  (ECF 81 at 6; ECF 83 at 4).[2]  He was not wearing a helmet.  (ECF 81 at 11).

As Hunter's dirt bike approached the police vehicles in the lot, the MSP cruiser pulled forward, narrowing the path of road available to his right.  (ECF 76 Ex. 1 at 2).[3]  Hunter decided to pass behind the cruiser, to his left.  (*Id.*).  When he was between two and three car lengths away, the BPD cruiser pulled quickly across the open gap behind the MSP cruiser.  (*Id.*).

Hunter crashed into the MSP cruiser, flew over the handlebars, and landed on the asphalt. (ECF 77 at 10).  At the time of the collision, there was a narrow gap between the BPD and MSP cruisers, wide enough for a person to walk through, but not much wider.  (ECF 76 Ex. 38 at 0:38-0:48).

There were at least a dozen witnesses to the crash, and they began discussing the incident with Officer Chrispin, Trooper Berry, and the other officers at the scene.  (*Id.* Ex. 7 at 13; *Id.* Ex.

---

[1] According to Trooper Berry, he and Officer Chrispin were parked "side by side," parallel to the curb. (ECF 68 at 4).

[2] This fact is disputed.  Trooper Berry reported to the defense expert "that he believed that the dirt bike was traveling a speed between 35 and 45 miles per hour."  (ECF 68 at 10).  Officer Chrispin accepts the 20 to 30 miles per hour estimate.  (ECF 81 at 6).

[3] This fact is not disputed, but the timing is.  Trooper Berry asserts that he moved his cruiser because he could hear, but not see, a motorcycle, "so he slowly moved his cruiser to gain sight of the motorcycle" and otherwise "was stationary from the time of seeing the plaintiff."  (ECF 68 at 4, 5).  Whether Trooper Berry's line of sight was obstructed is also disputed.  (ECF 78 at 8-9).

8 at 15-16; *Id.* Ex. 9 at 3).  Many of the witnesses were upset, shouting at the officers, and

accusing them of causing the collision.  (*Id.* Ex. 7; *Id.* Ex. 9 at 4; *Id.* Ex. 35 at 0:35-2:13; *Id.* Ex.

37 at 0:30-2:05).  Several witnesses filmed their conversations and the aftermath of the incident.

(*Id.* Ex. 13; *Id.* Ex. 14; *Id.* Ex. 35 at 2:38-3:11; *Id.* Ex.37 at 0:39-0:45, 1:01-1:02; 1:13-1:15).

The driver of the BPD cruiser, Officer Chrispin, called EMS.  (ECF 77 at 12).  An

ambulance arrived and took Hunter to the hospital.  (*Id.*).  Later, BPD officers went to see him in

the hospital.  (ECF 76 Ex. 1 at 5).  They asked whether he had been carrying a weapon.  (*Id.*).

When he answered truthfully that he had not, they pressed him further, which distressed him.

(*Id.*).

What Hunter did not know was that the police had been responding to a report of an

incident on the field next to the parking lot.  A park visitor had called 911, reporting that a black

man on a dirt bike had brandished a gun "near the overlook ruins . . . overlooking the athletic

field" and was riding with a companion.  (ECF 74 Ex. 4 at 2-5).

Several witnesses to the dirt-bike accident, including Laura Withrow, Dustin Farris,

Daisy Farris, and Karla Villar, knew that the 911 call had been placed.  (ECF 76 Ex. 6 at 2-4; *Id.*

Ex. 9 at 2).  They had overheard the conversation leading up to the call between a person they

did not see and two men with dirt bikes who had been riding around the field between the rear

parking lot and the overlook ruins.  (*Id.* Ex. 6 at 2-4; *Id.* Ex. 9 at 2).  After the call, the two men

approached Withrow and the Farrises, who were picnicking in the field.  (*Id.* Ex. 6 at 2-4).  The

men tried to show that they were not carrying weapons and were patting themselves down.  (*Id.*).

Karla Villar also spoke with the two men, who she came to understand were not carrying

weapons.  (ECF 74 Ex. 4 at 6; ECF 76 Ex. 37 1:16-1:30).  She called 911 to tell the police that

the prior call had been a false report.  (ECF 74 Ex. 4 at 6; ECF 76 Ex. 37 1:16-1:30).

When Trooper Berry and Officer Chrispin arrived at the scene, the two men on dirt bikes were present. (ECF 68 Ex. 7 at 1; ECF 76 Ex. 2 at 2-4). As a result of the call, the officers had received a Be On the Lookout ("BOLO") advisory for a black man on a blue and yellow dirt bike with a small firearm. (ECF 74 Ex. 7 at 0:01-0:52). The two men were black and riding dirt bikes; however, one bike was yellow and white, and one was green and white. (ECF 76 Ex. 6 at 3-4; *Id.* Ex. 7 at 4; *Id.* Ex. 9 at 2; ECF 74 Ex. 7 at 1:10-1:38). Neither officer attempted to stop or investigate those men, because they did not match the BOLO description. (ECF 81 at 2; ECF 83 at 2). When the two men on dirt bikes heard sirens approaching, they drove away from the lot, toward White Stadium, where the cruisers could not follow them. (ECF 68 Ex. 4 at 76).

Soon thereafter, Hunter rounded the corner on Pierpont Road, entering the parking lot beside the field from which the 911 call had been placed. (ECF 74 Ex. 4 at 6-8; ECF 81 at 2; ECF 83 at 2). He was riding a blue and white dirt bike. (ECF 81 at 2; ECF 83 at 1). He contends that he was riding at an ordinary speed, followed by a police cruiser going the same pace. (ECF 68 Ex. 13 at 82). When the cruiser turned on its lights and siren, Hunter sped up. (*Id.* at 85). At least one bystander thought he was trying to get out of the cruiser's way. (*Id.* at 83). The officers disagree about how obstructed their view of the parking lot entrance was, but they both saw a BPD cruiser with lights and siren on pull into the lot. (ECF 68 at 4; ECF 74 at 3).

According to Trooper Berry and Officer Chrispin, they readjusted their vehicles as Hunter approached, not to stop him, but to get a better look at the road leading into the lot and the cruiser pulling in. (ECF 68 at 4; ECF 74 at 3). According to both officers, Hunter tried to pass between their two cruisers, lost control of his dirt bike, and crashed into Trooper Berry's cruiser. (ECF 68 at 5-6; ECF 74 at 4). According to Hunter and at least some other

eyewitnesses, the movement of the vehicles appeared to be a maneuver designed to stop Hunter by causing a crash.  (ECF 76 Ex. 1 at 2; *Id.* Ex. 4 at 13-14; *Id.* Ex. 7 at 7-9; *Id.* Ex. 8 at 5-6).[4]

Hunter's counsel submitted internal-affairs complaints to both the Boston Police Department and the Massachusetts State Police.  (Compl. ¶ 24).  It appears that no resolution of those complaints has been shared with counsel.  (*Id.*; ECF 68; ECF 74; ECF 76 at 1-3).  This suit followed.

### B.    Procedural Background

Plaintiff filed a complaint in Suffolk Superior Court against the City of Boston, the Commonwealth of Massachusetts, Brian Berry, and Eddy Chrispin.  (Compl.).  The complaint asserted claims against the City of Boston and the Commonwealth for negligence and claims against the officers for use of excessive force under 42 U.S.C. § 1983 and for assault and battery under state law.  (*Id.* ¶¶ 36-49).

The City of Boston timely removed the case to this Court.  (ECF 1).  The Court remanded the claims against the Commonwealth to the Superior Court because it has not waived sovereign immunity in federal court as to negligence claims.  (ECF 23).  The Court also dismissed the claim against the City of Boston because the complaint alleged that Officer Chrispin committed intentional, not negligent, torts.  (ECF 41).

Both officers have moved for summary judgment on both the § 1983 claim and the state-law tort claim.  (ECF 67; ECF 71).

---

[4] There is no video evidence in the record of the accident and what led up to it.  Footage from the Boston Police Department camera set up to film the entrance to Franklin Park was not preserved, even though Hunter submitted a FOIA request less than two weeks after the accident.  (ECF 81 at 14).  Plaintiff has raised the issue of spoilation of evidence, but has not moved for sanctions under Rule 37 or otherwise.

## II.    Standard of Review

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991). Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

## III.    Analysis

Plaintiff's state-law tort claims depend on the constitutional reasonableness of defendants' use of force. *See Raiche v. Pietroski*, 623 F.3d 30, 40 (1st Cir. 2010). The Court will therefore address the federal claims first.

### A.    Excessive Force

The complaint asserts claims under 42 U.S.C. § 1983 against the two officers for using excessive force in violation of the Fourth Amendment right "to be free from unreasonable . . . seizures." U.S. CONST. amend. IV. It alleges that defendants together maneuvered their vehicles to stop plaintiff by causing him to crash, even though they had no probable cause to arrest him and consequently no justification for the use of force. Defendants

contend that they did not violate plaintiff's Fourth Amendment rights and, even if they did, that

they are protected by qualified immunity.

Claims under § 1983 have two essential elements:  "[1] the defendant must have acted

under color of state law, and [2] his or her conduct must have deprived the plaintiff of rights

secured by the Constitution or by federal law."  *Gagliardi v. Sullivan*, 513 F.3d 301, 306 (1st Cir.

2008).  It is undisputed here that the individual defendants were acting under color of state law

during their encounter with plaintiff; the issue is whether their actions deprived him of his

constitutional rights, and, if so, whether they are entitled to qualified immunity.  *See West v.*

*Atkins*, 487 U.S. 42, 50 (1988).  Qualified immunity, in turn, depends on a two-part test:  (1)

whether the facts shown by the plaintiff make out a violation of a constitutional right, and (2)

whether the right at issue was clearly established at the time of the defendant's alleged

misconduct.  *See Maldonado v. Fontanes*, 568 F.3d 263, 268-69 (1st Cir. 2009).

### 1.    Constitutional Violation

"To establish a Fourth Amendment violation based on excessive force, a plaintiff must

show that the defendant officer employed force that was unreasonable under the circumstances."

*Jennings v. Jones*, 499 F.3d 2, 11 (1st Cir. 2007) (citing *Graham v. Connor*, 490 U.S. 386, 397

(1989)).  A plaintiff must show (1) that there was a "seizure" within the meaning of the Fourth

Amendment, and that (2) the use of force during the seizure was unreasonable.  *See Graham*, 490

U.S. at 395.  The parties dispute both issues here.

A law-enforcement officer "seizes" a person when he terminates that person's freedom of

movement through the application of force or through a show of authority to which the person

yields.  *See United States v. Howard*, 66 F.4th 33, 42 (1st Cir. 2023).  But if a person terminates

his or her own freedom of movement in a way that the officer does not intend, no seizure occurs.

*See Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989).

Here, there is a factual dispute over whether plaintiff was "seized." Defendants maintain that plaintiff crashed into the cruiser accidentally, because of his own carelessness. (ECF 68 at 5-6; ECF 74 at 4). However, multiple witnesses testified that the cruisers' movements did not allow plaintiff enough time to stop except through a collision. (ECF 76 Ex. 1 at 2; *Id.* Ex. 4 at 13-14; *Id.* Ex. 7 at 7-9; *Id.* Ex. 8 at 5-6). A reasonable jury could find that defendants in fact intended to stop him by means of a collision. That, if proved, would establish a "seizure." *See Brower*, 489 U.S. at 597 ("If . . . the police cruiser had pulled alongside the fleeing car and sideswiped it, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure."). The critical question, then, is whether—assuming a seizure occurred—the officers' use of force was reasonable.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion." *Id.* Only *excessive* force is actionable; "not every push or shove rises to the level of a constitutional violation." *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 205 (1st Cir. 1990). The objective reasonableness of the force used is determined according to a balancing test that considers, among other things, the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*.

Here, viewing the record is the light most favorable to the plaintiff, the *Graham* factors suggest an unreasonable use of force.  It is true that the officers responded to a call reporting an assault with a deadly weapon, which is a serious crime.  But there is no evidence at all that plaintiff posed an immediate threat to the officers or the public, or that a reasonable officer would have thought he did.  And he was not resisting or evading arrest.  The fact that he arrived in the parking lot at the same time as other responding officers may have created a momentary impression that he was fleeing the police.  But plaintiff was given no order or indication that he should stop.  Indeed, defendants themselves maintain that they were not attempting to stop plaintiff at all, entirely undermining any claim that the exigencies of the situation justified the alleged use of force.

Furthermore, the *Graham* factors are not exclusive, and do not always capture the totality of the circumstances relevant to the reasonable use of force.  *See Graham v. Connor*, 490 U.S. 386, 396 (1989).  Here, even though the crime that the officers were responding to was serious, their justification for suspecting the plaintiff of that crime was limited at best.  And the reasonableness of force depends directly on the justification for and purpose of that force.  *See United States v. Acosta-Colon*, 157 F.3d 9, 15 (1st Cir. 1998).  If there is no probable cause to arrest a suspect, an officer may only use the kind of force appropriate to effect an investigative stop.  *See Morelli v. Webster*, 552 F.3d 12, 21 (1st Cir. 2009) ("Because a reasonable jury could find a de facto arrest, Webster's actions would be justified only if he acted on probable cause.").

There is no precise formula for probable cause, which depends on the totality of the circumstances and requires greater justification than the reasonable suspicion required to initiate an investigative stop.  *See Alabama v. White*, 496 U.S. 325, 328, 330 (1990).  Where, as here, suspicion of criminal activity arises from a tip, the informant's veracity, reliability, and basis of

knowledge are highly relevant, but not dispositive factors. *Id*. at 328. And corroborating predictive information about a suspect, if that information is not easily known, can also establish probable cause for an arrest. *See Illinois v. Gates*, 462 U.S. 213, 245–46 (1983).

No reasonable officer in the position of defendants would have thought he had probable cause to arrest the plaintiff for possessing or brandishing a weapon. The 911 call fell far short of establishing probable cause to arrest anyone, let alone plaintiff. The call was made by a person who identified himself by first name; who was calling from another person's phone; who abandoned the 911 call partway through; and who left the scene of the incident he was reporting despite the 911 operator's guidance. (ECF 74 Ex. 4 at 2-5). The call also provided no predictive information, only the kind of descriptive information that is generally insufficient to establish even reasonable suspicion to conduct a search. *See Florida v. J.L.*, 529 U.S. 266, 268 (2000) (holding that an anonymous tip that a black man in a plaid shirt at a particular bus stop was carrying a gun is not sufficient to justify an investigative stop and frisk of a person matching each element of that description).

Furthermore, the descriptive information the caller provided did not match the plaintiff in certain key respects. Plaintiff was arriving at, rather than fleeing from, the site of the 911 call. (ECF 76 Ex. 1 at 2; *Id.* Ex. 45 at 1). And he fit the BOLO description no better than the people the defendants chose not to pursue. (ECF 74 Ex. 7 at 1:10-1:38). While an investigative stop may have been justified, a full arrest was not, and no reasonable officer would have thought it was.

The question then becomes whether the use of force was justified to effect an investigative stop. The scope of an investigative stop "must be strictly tied to and justified by the circumstances which rendered its initiation permissible." *See Terry v. Ohio*, 392 U.S. 1, 19

11

(1968). The use of substantial force, such as handcuffing or tackling a suspect, may sometimes be reasonable to restrain the subject of an investigative stop without turning the stop into an arrest. *See Acosta-Colon*, 157 F.3d at 18. But those circumstances are "rare," and such uses of force are not appropriate "as a matter of routine" in an investigative stop. *Id.* Importantly, even those non-deadly uses of force must be justified by the needs of the stop. *See, e.g.*, *United States v. Taylor*, 162 F.3d 12, 20 (1st Cir. 1998) (appropriate to draw weapon when pulling over car thought to be driven by armed drug dealers); *United States v. Maguire*, 359 F.3d 71, 78 (1st Cir. 2004) (appropriate to tackle suspect to the ground when he reaches into waistband for a weapon).

Furthermore, the First Circuit has repeatedly held that even moderate assertions of force may be excessive when used against a person who could lawfully be arrested but who is not resisting arrest. *See Morelli*, 552 F.3d at 23; *Alexis v. McDonald's Restaurants of Massachusetts, Inc.*, 67 F.3d 341, 353 (1st Cir. 1995). In *Morelli*, the First Circuit held that a police officer used unconstitutional excessive force when he pinned a woman he suspected of prostitution against a wall for three minutes, dislocating her shoulder. *See Morelli*, 552 F.3d at 23. The court reasoned that she was suspected of low-level offenses, was not resisting arrest, and was not a danger to the public. *Id.* Similarly, in *Alexis*, the court held that a police officer arresting a compliant person for trespassing used unconstitutional excessive force when he dragged her out of a restaurant booth in a way that bruised her shins. *Alexis*, 67 F.3d at 353.

Here, unlike in *Morelli* and *Alexis*, defendants suspected plaintiff of carrying a gun. Yet police officers can initiate a frisk only if they have reasonable suspicion a person is "armed and presently dangerous." *Terry*, 392 U.S. at 31. If that alone were enough to justify using potentially deadly force, the logic underpinning *Terry*—that more limited suspicion justifies

more limited intrusions—would be undone. *Id*. at 27. And, in this case, there is little else supporting the use of incapacitating force.

Again, there was no probable cause to arrest plaintiff for brandishing a firearm. Under the circumstances, inducing a motor-vehicle collision exceeds the bounds of a reasonable investigative stop. No reasonable officer in the defendants' position would have believed that unwarned, incapacitating force was required to investigate whether plaintiff was the subject of the 911 call. Other means of effecting a stop were safely, readily, and obviously available to them, most especially issuing a verbal command or other signal for him to stop. *See, e.g.*, *United States v. Lee*, 317 F.3d 26, 30 (1st Cir. 2003) (when confronted with an attempt at flight in a parking lot, officer appropriately "blocked [suspects'] path, turned on his blue lights, drew his firearm, [ ] directed his canine companion to bark . . . [and] ordered them to step out of the van and show their hands."). Of course, a reasonable officer in defendants' position may have used some degree of force or coercion. *See United States v. Jones*, 700 F.3d 615, 625 (1st Cir. 2012). But under the circumstances facing the defendant officers here, inducing a vehicle collision with the plaintiff, without warning and without probable cause, would violate plaintiff's right to be free from the use of excessive force. And the record contains sufficient evidence that a reasonable jury could believe that is what happened.

Plaintiff has therefore raised a genuine issue as to whether the type and degree of force used was reasonable under the circumstances, and therefore whether defendants violated his right to be free from unreasonable seizure. The viability of his claim thus turns on whether the defendants are entitled to qualified immunity for their conduct.

### 2.    Qualified Immunity

Qualified immunity shields officers from liability unless they have violated a clearly established right. It is not enough for some right to be clearly established at a highly abstract

level.  Instead, it must be that, "under the circumstances that confronted the official, 'a reasonable official would understand that what he is doing violated that right.'" *Berthiaume v. Caron*, 142 F.3d 12, 15 (1st Cir. 1998) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  The question is "whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right." *Burke v. Town of Walpole*, 405 F.3d 66, 77 (1st Cir. 2005).  The qualified-immunity doctrine "leaves 'ample room for mistaken judgments.'" *Berthiaume*, 142 F.3d at 15 (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).

This "clearly established" inquiry, in turn, has two parts:  "(a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right." *Mlodzinski v. Lewis*, 648 F.3d 24, 32-33 (1st Cir. 2011).  Although that test does not require that a pre-existing case be "directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "Precedent involving similar facts can help . . . provide an officer notice that a specific use of force is unlawful." *Kisela v. Hughes*, 584 U.S. 100, 105 (2018).  But "officials can still be on notice that their conduct violates established law even in novel factual circumstances," when the violation is so unreasonable as to be "obvious."[5] *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Very few cases specifically involve the use of substantial force against the subject of an investigative stop when the suspect has done nothing to resist the stop.  *See* Use of force; show of force, 4 Search & Seizure § 9.2(d) (6th ed.) ("The lower courts have likewise seldom been

---

[5] It would be odd, to say the least, to shield officers from liability for violations so obvious that they rarely occur and even more rarely reach appellate review.

faced with the issue" of how to analyze the use of force in initiating *Terry* stops, "apparently

because in the overwhelming majority of instances suspects comply with a verbal command to

stop."). Indeed, it appears to be an issue of first impression in this Circuit whether police may

use deadly or near-deadly force to effect an investigative stop of a non-resisting person.

Nevertheless, there is no question that the use of incapacitating force on a non-resisting

person to effect an investigative stop violates clearly established law. It has long been

established that it is unreasonable to use even moderate physical force to arrest a non-resisting

person for a low-level offense. *See Morelli*, 552 F.3d at 23; *Alexis*, 67 F.3d at 353. While here,

defendants suspected plaintiff of carrying a gun, that, alone, cannot justify using potentially

deadly force. *See Terry*, 392 U.S. at 19, 27. He posed no more danger than an ordinary subject

of an investigative stop, and resisted no more than did the suspects in *Morelli* and *Alexis*. *See id.*

at 31. And those suspects, unlike him, could have been lawfully arrested. *See Morelli*, 552 F.3d

at 23; *Alexis*, 67 F.3d at 353.

It is therefore "beyond debate" that an officer uses unconstitutional excessive force when

he initiates the seizure of a person who could not lawfully be arrested by causing a vehicle

collision with that person. *al-Kidd*, 563 U.S. at 741. Where no reasonable officer would have

believed that there existed probable cause to arrest the plaintiff for carrying a weapon, the mere

suspicion that he was armed—without more—clearly could not justify the use of deadly or near-

deadly force. *See Terry*, 392 U.S. at 19, 27.; *cf. New York State Rifle & Pistol Ass'n, Inc. v.

Bruen*, 597 U.S. 1, 10 (2022) ("[T]he Second and Fourteenth Amendments protect an

individual's right to carry a handgun for self-defense outside the home.").

The final question is "whether in the particular factual context of the case, a reasonable

officer would have understood that his conduct violated the right." *Mlodzinski*, 648 F.3d 24, 32-

33. Unquestionably, a reasonable officer would have understood that precipitating a vehicle collision with a non-resisting person who could not lawfully be arrested would violate that person's right to be free from excessive force. But for plaintiff's claim to overcome qualified immunity, a reasonable officer in each defendant's position must have known that those were the circumstances he faced.

As described above, no reasonable officer would have thought that he had probable cause to arrest plaintiff for brandishing a weapon in the park. And, interpreting the record in the light most favorable to plaintiff, a reasonable officer acting as defendants did here would have understood that he was likely to cause a dangerous collision. A reasonable jury could find that Trooper Berry pulled forward intending to block a large section of available road, and that Officer Chrispin closed the gap behind Berry's cruiser, leaving plaintiff no time to stop. Finally, no reasonable officer, crediting plaintiff's evidence, would have thought he was fleeing the police. Laura Withrow, an eyewitness to the accident, reported that plaintiff entered the parking lot at a leisurely pace, "just nonchalantly minding his own business," going the same speed as the cruiser behind him. (ECF 68 Ex. 13 at 82). Withrow also testified that when the cruiser's lights and siren went on, plaintiff "looked like he was trying to move out of the way" and "trying to clear space for vehicles trying to get through." (*Id.*at 83). These facts, if proved, make any assumption of flight an unreasonable mistake, precluding qualified immunity.

There is therefore a genuine factual dispute over whether a reasonable officer could have believed that deliberately causing a collision with plaintiff was constitutional. In fact, there is a genuine factual dispute about whether the officers precipitated a collision with Hunter at all. But there is no real dispute that a reasonable officer would know, on plaintiff's account of the evidence, that each defendant's actions would be unconstitutional.

In summary, viewing the evidence in the light most favorable to plaintiff, a reasonable jury could find that the officers here used excessive force against plaintiff. A reasonable jury could find that defendants together acted in a way that violated the clear contours of the right to be free from excessive force, and that a reasonable officer in defendants' position would have understood that the actions they took violated that right. Accordingly, defendants are not entitled to qualified immunity on the claim of excessive force, and summary judgment will be denied as to Counts 5 and 6.

**B.      <u>Assault and Battery</u>**

Massachusetts law allows for common-law assault-and-battery claims against police officers for their conduct during an arrest. *Raiche*, 623 F.3d 30, 40 (1st Cir. 2010). "However, Massachusetts law also allows an officer to use reasonable force in conducting a lawful arrest," and therefore "reasonable force is a valid defense to assault and battery." *Id.* Where, as here, the complaint alleges both a § 1983 excessive-force claim and state-law claims for assault and battery, the reasonableness of the force used with respect to the § 1983 claim controls the assault analysis. *Id.* Qualified immunity for a § 1983 claim, however, will not necessarily foreclose liability for common-law tort claims. *See Lachance v. Town of Charlton*, 990 F.3d 14, 31 (1st Cir. 2021).

As described above, using a vehicle collision to effect a seizure of a non-fleeing, non-resisting suspect is an objectively unreasonable use of force. Because the record, construed in the light most favorable to plaintiff, supports a finding that defendants intentionally maneuvered their vehicles to cause a collision with the plaintiff, summary judgment will be denied as to Counts 3 and 4.

17

## IV.    <u>Conclusion</u>

For the foregoing reasons, the motions for summary judgment of defendant Eddy

Chrispin and defendant Brian Berry are DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  January 13, 2025                    Chief Judge, United States District Court

18